CLYDE CARRELL, Plaintiff-Appellee, *v.* DR. ANTHONY FRANCONA *et al.,* Defendants-Appellants.

(No. 55945;

First District (4th Division)—May 16, 1973.

BURMAN, P. J., dissenting.

Tom L. Yates, of Chicago, (Carl E. Abrahamson, of counsel,) for appellant.

Cooney and Stenn, of Chicago, (Joseph V. Roddy, of counsel,) for appellee.

Mr. JUSTICE DIERINGER delivered the opinion of the court:

The defendant, Dr. Anthony Francona, appeals from a judgment entered in the Circuit Court of Cook County following a jury trial awarding the plaintiff damages in the sum of $35,000.

The issues presented on appeal are: (1) whether the trial court erred in denying the defendant's motion for a directed verdict; (2) whether the verdict is contrary to the manifest weight of the evidence; (3) whether the trial court erred in refusing to submit the issue of assumption of risk to the jury; (4) whether the trial court erred in overruling the defendant's objection to a hypothetical question propounded to a certain witness; (5) whether the defendant was afforded a fair trial, free of prejudicial error; (6) whether the damages awarded to the plaintiff are excessive; and (7) whether the trial court erred by submitting a certain instruction to the jury tendered by the plaintiff and refusing to submit a certain instruction tendered by the defendant.

In September, 1953, Dr. Anthony Francona purchased a chicken farm and small residence, together with adjoining properties, in Lake Villa, Illinois. Soon thereafter, Dr. Francona hired the plaintiff, Clyde Carrell, a journeyman electrician, for the purpose of managing a chicken-raising business which Dr. Francona intended to conduct. As part of a written employment contract, the plaintiff was to live in the residence on the premises of the chicken farm and oversee the chicken-raising business.

The plaintiff arrived at the farm on October 26, 1953, and began preparations for raising the chickens, which arrived on November 16, 1953. The house where the chickens were to be raised was a two-story structure divided into four separate rooms. Each room contained six to eight brooders which were used for warming the chickens. Each brooder had a double electrical socket over it, of which one socket was used for a light over the brooder and one socket for an extension cord attached to a light underneath the brooder. The double sockets were connected to a main fuse box which held 15 and 20 amp fuses. There were also some 30 amp fuses in use for an automatic feeder which carried seed to each of the four rooms in the chicken house. The fuse box was located on the wall inside the door of the building. The fuse box had a handle on it which, when pulled down, cut off all electrical power to the circuits within the chicken house, as well as to the plaintiff's residence adjacent to the building.

The plaintiff began to experience difficulty with the electrical system early in December, 1953. The difficulty was caused by an overload on the main system which was burning out the fuses. The plaintiff informed Dr. Francona of the difficulty, as well as the fact that the system was inadequate and could not be repaired. He recommended replacement of the system, which Dr. Francona said could only be considered after the first chicken litter was completed. The plaintiff also complained to Dr. Francona of difficulties with the electrical system caused by Dr. Francona's use of the double electrical sockets over the brooders and the replacement of the light bulbs in the brooders with higher wattage bulbs, both of which only caused more of an overload on the already over-loaded system. Thereafter, the plaintiff substituted the light bulbs with lower wattage bulbs; the system, however, remained overloaded to the point where in the remaining weeks in December, the plaintiff had to replace the fuses five times.

At approximately 1:00 A.M. on January 4, 1954, the plaintiff was awakened by his wife, who told him the house lights were dimming. When the plaintiff looked out the window toward the chicken house, he saw the west end of the second floor in flames. He quickly dressed

and ran to the chicken house to turn off the electrical power in the chicken house, thereby cutting the power and protecting his own residence. After entering the chicken house, the plaintiff reached the main switch on the fuse box and turned if off; however, a rush of air shut the door behind him. In attempting to escape from the burning building, the plaintiff was burned quite seriously on his head, hands, face and body. After thirty-one days in the hospital, the plaintiff was released, but due to the severity of his injuries was no longer able to work at his former trade as a journeyman electrician.

The plaintiff thereafter filed a complaint in the Circuit Court of Cook County alleging the fire which caused his injuries was the result of the defendant's negligence in that the electrical system was insufficient, defective and unsafe. At a subsequent trial, certain testimony relative to the allegedly defective electrical system was presented. Dr. Francona, called as an adverse witness, denied having any notice of defects in the electrical system prior to purchasing the chicken farm. He also could not recall the plaintiff ever complaining to him about the inadequacies of the electrical system. The defendant, however, testified he had occasion to speak with the plaintiff concerning the fuses blowing, whereupon defendant recommended the plaintiff replace the large watt bulbs in the chicken house with bulbs of lower wattage. This, to the defendant's knowledge, resulted in the plaintiff encountering no further fuse difficulty.

Frank Kasky, a detective assigned to the Chicago Police Department Bomb and Arson Unit, was called as a witness by the plaintiff. After being qualified as an expert as to the causes of fires, Mr. Kasky was asked a hypothetical question as to the cause of a fire under circumstances similar to those which were present when the plaintiff was injured. Mr. Kasky responded that, in his opinion, such a fire could only originate from an overload on an inadequate electrical system.

Lester Hamlin testified he was the electrical contractor who installed the main electrical system in the chicken house. Mr. Hamlin stated the main switch for the system was located in a vestibule outside the actual brooder house. On cross-examination, Mr. Hamlin testified he had no knowledge of the chicken house or its electrical system for the years 1952, 1953 and 1954. He did state, however, that if the cause of the fire was electrical, cutting the electrical power, as the plaintiff was attempting to do when he was burned, would be helpful in stopping further damage.

Kenneth Sheldon, a former resident of the premises, testified he remembered the main switch for the electrical system to be outside the

chicken house. On cross-examination, Mr. Sheldon admitted he had not seen the house since 1949.

Paul Sheldon testified he had sold the premises to the defendant. He, likewise, testified the main switch for the electrical system was outside the entrance to the chicken house. On cross-examination, Mr. Sheldon did state that although he raised chickens while living on the premises, he hired a manager to do the work.

John Ziah, an attorney and certified court reporter, testified he had occasion soon after the fire in January, 1954, to record an interview he had with the plaintiff while he was confined to St. Anne's Hospital, Chicago. Mr. Ziah testified the plaintiff, on the occasion of the interview, stated he did not know what could have caused the fire.

The foregoing evidence was submitted to the jury, which returned a verdict in favor of the plaintiff and awarded him damages in the amount of $35,000. The defendant herein appeals from the judgment entered by the trial court on that verdict.

The first issue presented for review is whether the trial court erred in denying the defendant's motion for a directed verdict.

The defendant contends the trial court erred in denying his motion for a directed verdict in that the evidence presented by the plaintiff failed to prove the allegations contained in his complaint because the plaintiff never proved the negligence charged to the defendant was the proximate cause of his injury. In view of this contention, the defendant asserts the verdict of the jury in favor of the plaintiff and against the defendant totally lacks support and, therefore, the trial court erred in denying the motion for a directed verdict.

■■ The law in Illinois relative to whether a trial court has properly refused to direct a verdict is well settled. In *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill.2d 494, 510, the court stated:

"In our judgment verdicts ought to be directed and judgments n.o.v. entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand."

■■ After a thorough review of the record in the instant case, applying the standard set forth in *Pedrick* as to directed verdicts, we find the trial court's denial of the defendant's motion for a directed verdict to be amply supported by the great weight of the evidence preserved in the record. For this reason, we find the defendant's contention that the trial court's denial of his motion for a directed verdict was error is totally lacking in merit.

The second issue presented for review is whether the verdict of the

jury is contrary to the manifest weight of the evidence. The defendant contends the verdict of the jury in favor of the plaintiff is patently contrary to the manifest weight of the evidence. The basis for the defendant's contention is that the jury could only have returned a verdict in favor of the plaintiff by arbitrarily rejecting the testimony of the following defense witnesses: Lester Hamlin, the contractor who installed the electrical system in the chicken house; Kenneth Sheldon, a former resident of the premises; Paul Sheldon, the former owner and operator of the premises; and John Ziah, who took the plaintiff's statement soon after the accident. In support of this contention, the defendant relies on the definition of the term "manifest weight" as stated by the court in *Roth v. Lissner Iron and Metal Co.*, (1967), 88 Ill.App.2d 352:

> "A verdict is against the 'manifest weight' when an opposite effect is 'clearly apparent,' *Tabor v. Tazewell Serv. Co.*, 18 Ill. App.2d 593, 153 N.E.2d 98 (3d Dist., 1958) or the finding of the jury appears to be 'unreasonable, arbitrary, and not based on the evidence,' *Stobbs v. Cumbry*, 9 Ill.App.2d 138, 132 N.E.2d 448 (3d Dist., 1956)."

A review of the testimony of the aforementioned witnesses as it is preserved in the record reflects that the jury did not arbitrarily reject their testimony and thereby reach a verdict contrary to the manifest weight of the evidence. The jurors witnessed not only the testimony of the four witnesses on direct examination but also their testimony on cross-examination. Furthermore, the jury also viewed the testimony of plaintiff, and the expert witness called by the plaintiff, Frank Kasky. Although the defendant does not mention the testimony of either the plaintiff or Mr. Kasky in discussing his contention, such testimony was heard by the jury and, therefore, also merited their consideration. In view of these facts, we must apply the standard set forth in *Allen v. Colaw* (1969), 27 Ill.App.2d 304, wherein the court stated that for a verdict of a jury to be overturned, the opposite conclusion from what the jury found must be both clear and convincing to the reviewing court. Since the record in the instant case neither clearly nor convincingly reflects the opposite conclusion from that which the jury found, we must reject the defendant's contention that the finding of the jury is contrary to the manifest weight of the evidence.

The third issue presented for review is whether the trial court erred in refusing to submit the issue of assumption of risk to the jury. The defendant contends the trial court improperly refused to submit the issue of assumption of risk, in the form of defendant's instruction No. 12, to the jury. This instruction was based on the defendant's assertion that he had pleaded assumption of risk as an affirmative defense and, as such,

the issue should have been submitted to the jury for consideration. Therefore, the refusal by the trial court to submit the issue to the jury for their consideration effectively denied the defendant a defense to which he was entitled and is error.

■■ A thorough review of the record in the instant case reflects the pleading wherein the affirmative defense of assumption of risk is located was not in existence until the day the case went to the jury. This, in itself, does not preclude the trial court from submitting the issue to the jury. However, the record is devoid of any motion by defense counsel requesting the trial court admit such pleading. Furthermore, there is no indication on the face of the pleading or elsewhere in the record that the trial court allowed such pleading as an amendment to the defendant's answer. We, therefore, conclude the trial court properly denied defendant's instruction No. 12 based on the issue of assumption of risk, since the issue of assumption of risk was never before the court.

The fourth issue presented for review is whether the trial court erred in overruling the defendant's objection to a hypothetical question propounded to a certain witness. The basis for the defendant's contention lies in his assertions that there is no evidence in the record to support that element of the question wherein it is stated approximately twenty or more double sockets were being used almost continually; that there is no evidence of an overload in the electrical system prior to October, 1953; and that the witness, Frank Kasky, was not qualified to answer the question.

■■ There is ample evidence in the record in the form of plaintiff's uncontradicted testimony to the effect that there were between twenty-four and thirty-two double sockets in the chicken house. There is further testimony by the plaintiff to the effect that the lights above and beneath the brooders, which were connected to the double sockets, were in use twenty hours each day. The record also reflects the defendant's assertion that there is no evidence of an overload on the electrical system prior to October, 1953, is likewise erroneous. In *Oberkircher v. Chicago Transit Authority* (1963), 41 Ill.App.2d 68, the court stated:

> "[T]he rule is that where a statement made by a party contradicts his testimony as a witness in the trial it may be used not only for the purpose of impeachment but as evidence against him."

■■ In the instant case, Dr. Francona, testifying as an adverse witness pursuant to section 60 of the Illinois Civil Practice Act (Ill. Rev. Stat., ch. 110, § 60), was questioned concerning his knowledge of an overload on the system prior to October, 1953. During his testimony, Dr. Francona denied any notice of an overload, whereupon a portion of a deposition taken of Dr. Francona subsequent to the fire was introduced into

the record. In that deposition, Dr. Francona acknowledged notice of an overload on the system prior to October, 1953, was given to him by a prior occupant of the farm. Applying the rule set forth in *Oberkircher v. Chicago Transit Authority, supra,* to this statement made by Dr. Francona in direct contradiction of his testimony, we necessarily hold that such a statement may be used as evidence against him. Therefore, contrary to the defendant's assertion, there is evidence in the record of an overload on the electrical system prior to October, 1953.

■■■ The defendant finally asserts the witness, Frank Kasky, was not qualified to answer the hypothetical question propounded to him. Once again the record discloses the defendant is in error. When Mr. Kasky, a detective assigned to the Chicago Police Department Bomb and Arson squad for eleven years, was called to testify, plaintiff's counsel more than adequately showed Mr. Kasky to be qualified as an expert in determining the causes of fires. Since the determination of whether an alleged expert is qualified is largely within the discretion of the trial judge (*Garrett v. S. N. Nielsen Co.* (1964), 49 Ill.App.2d 422), and since the defendant has failed to show an abuse of discretion by the instant trial judge in ruling Mr. Kasky an expert witness, we will not substitute our judgment for that of the trial court.

■■ In light of the foregoing evidence, we therefore necessarily reject the defendant's contention that the trial court erred in overruling his objection to the hypothetical question propounded to the expert witness.

The fifth issue presented for review is whether the defendant was afforded a fair trial free of prejudicial error. The defendant contends he was not afforded a fair trial in that plaintiff's counsel repeatedly and knowingly injected prejudicial remarks to the defendant's detriment. The defendant further contends he was denied a fair trial in that the trial court not only made improper rulings on the evidence but also made improper remarks in the presence of the jury. In support of these dual contentions, the defendant cites numerous instances throughout the record which he considers to be exemplary of such improper conduct and prejudicial remarks by both plaintiff's counsel and the trial court. The defendant asserts such conduct and remarks are preserved for review, even though he did not object to such remarks based on the decision in *Paulsen v. Gateway Transportation Co.* (1969), 114 Ill.App.2d 241, wherein the court stated:

> "In a case where prejudicial arguments or improper conduct of counsel affect the case to the extent that the litigants cannot receive a fair trial and the judicial process suffers deterioration, this court may consider such an assignment of error even though

no objection was made and no ruling made or preserved thereupon by court or counsel."

■■ Once again a thorough review of the record indicates the defendant's contention lacks merit and deserves scant consideration. Moreover, the defendant's reliance on the decision in *Paulsen v. Gateway Transportation Co., supra,* is inappropriate when judging the tenor of the alleged prejudicial comments and improper conduct which the defendant urges this court consider. These alleged comments and conduct do not, in the opinion of this court, affect the defendant's case to the extent of denying him a fair trial, nor does allowing them to stand indicate the judicial process has suffered the slightest deterioration as the defendant would have us believe. We, therefore, reject the defendant's contention that he was not afforded a fair trial.

The sixth issue presented for review is whether the damages awarded to the plaintiff are excessive. The defendant contends the jury award of damages in the amount of $35,000 is excessive and highly unreasonable. In support of this contention that defendant relies on a series of Illinois cases wherein damages awarded by the trial court were held to be excessive. (*Hyatt v. Cox* (1965), 57 Ill.App.2d 293; *Clarke v. Rochford* (1967), 79 Ill.App.2d 336; *DeMilio v. Schnoor* (1967), 84 Ill.App.2d 250.) The defendant further supports his contention by his assertion that the plaintiff's hospital and nursing bills amounted to only $1,402, and that the plaintiff's attending physician did not testify at trial.

■■ The defendant's obvious dissatisfaction with the damage amount awarded by the jury is based on a very narrow interpretation of the damage evidence. The defendant apparently reasons that damages should only be awarded to the plaintiff in the amount of his hospital and nursing bills. Such an interpretation by the defendant is highly erroneous. A review of the uncontradicted evidence preserved in the record reflects the plaintiff not only incurred medical and nursing bills amounting to $1,402 but also lost nine months of wages which amounted to approximately $7,000. Furthermore, the plaintiff could no longer continue his trade as a journeyman electrician due to the severity of his injuries and is now forced to work at a substantial reduction in earnings. In view of these facts, we must reject the defendant's contention that the damages awarded the plaintiff are excessive.

The final issue presented for review is whether the trial court erred in submitting a certain instruction to the jury which was tendered by the plaintiff and refusing to submit a certain instruction tendered by the defendant. The defendant first contends the trial court erred in submitting plaintiff's instruction No. 6 to the jury. This was the instruction

in which the allegations of negligence against the defendant from the plaintiff's complaint were set forth, and is called the issues instruction. The basis for the defendant's contention lies in his assertion that there is no evidence in the record to support the plaintiff's allegations as listed in the instruction.

■■ Upon reviewing the evidence preserved in the record, it is apparent to this court the allegations contained in plaintiff's instruction No. 6 were supported by the evidence and all reasonable inferences that flowed from that evidence. The allegations in the complaint and as stated in the instruction are that the electrical system was defective; that the defendant was aware of the defective condition of the system; and that the defendant negligently failed to remove the defect. The uncontradicted testimony of both the plaintiff and the defendant clearly establish these allegations to be fact. It was therefore not error for the trial court to submit plaintiff's instruction No. 6 to the jury for its consideration.

The defendant secondly contends the trial court erred in refusing to submit defendant's instruction No. 12 to the jury. We do not find it necessary to discuss this contention, however, since defendant's instruction No. 12 was discussed previously in this opinion.

For the reasons contained herein, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

ADESKO, J., concurs.

Mr. PRESIDING JUSTICE BURMAN dissenting:

The plaintiff alleged that the defendant, Dr. Anthony Francona, was negligent in that he knew, or in the exercise of ordinary care should have known, that the electrical system in the chicken house was insufficient and defective and in that he permitted a fire hazard by allowing it to remain in this condition. I believe that these allegations were not proved by the evidence which appears in the record and that the court should have directed a verdict for the defendants.

Dr. Francona and the plaintiff first met in 1936 at a Civilian Conservation Corps camp in which they were both employed. Since then they had been friends, and Dr. Francona had been the plaintiff's physician. In the fall of 1953 the plaintiff was employed as a journeyman electrician. He learned of Dr. Francona's plans to invest in a chicken raising business through their friendship and approached the doctor about becoming manager of the chicken farm, stating that he had had "some experience

with farming." This led to the employment agreement which was executed on October 7, 1953.

It was undisputed that the purchase of the Lake Villa property was Dr. Francona's first venture into the chicken raising business. He received no notice of any defect in the electrical system prior to or at the time of his purchase of the farm. He never resided on the premises. In October, 1953, the plaintiff and his family moved into the residence pursuant to the terms of the employment agreement.

The plaintiff testified that he inspected the electrical system in the chicken house shortly after he arrived "because he was curious" about it. He reported no defects to Dr. Francona nor made any complaint at that time.

The employment agreement provided, among other things, that the plaintiff had the responsibility of repairing and maintaining the premises and all equipment on it. He did some electrical work in the chicken house, which included putting in an additional line and replacing fuses and light bulbs periodically. He used his own judgment as to the loads which the system would bear and as to the types of fuses and bulbs which should be employed. He also testified that on one occasion he wired around a fuse after it had burned out. Once or twice during this period he mentioned to Dr. Francona that he thought the electrical system was outmoded and should be replaced, but he never indicated that the system created a fire hazard or that it could not be utilized safely until the first litter of chicks was raised and sold.

Under the employment agreement the plaintiff was to make all minor repairs on the premises at his own expense. He was obligated to purchase one half of the equipment needed for operation of the farm. His compensation was based upon a percentage of the profits derived from the sale of the chicks. He was obligated to cooperate with the representatives of Corn-Belt Hatcheries and to report to Dr. Francona, but was otherwise in complete control of the operation and maintenance of the farm.

As the foregoing demonstrates, there is a complete absence of any direct or positive evidence that Dr. Francona was negligent. The plaintiff was in complete charge and control of the premises and was better informed of its condition than Dr. Francona. The plaintiff was a journeyman electrician. He had done work on the chicken house and was familiar with the wiring in it. At no time did Dr. Francona receive any notice that the electrical system was a fire hazard. He did not have sufficient personal knowledge to evaluate the system, and he relied upon the expertise of the plaintiff, whose duty it was to maintain the premises.

It is also well settled in Illinois that an employee, particularly one who is in complete charge and is a specialist, assumes the risk of known

dangers, as well as those which are so obvious that knowledge of their existence is fairly to be presumed. (*Chicago & E.I.R.R. v. Heerey*, 203 Ill. 492, 495-97.) It is also well settled that the question of contributory negligence is distinct from that of assumption of risk. (*Kelley v. Fletcher-Merna Cooperative Grain Co.*, 29 Ill.App.2d 419, 425-26.) Although the defendant affirmatively pleaded assumption of risk as a defense, the court refused to submit the issue to the jury. In so doing, the court deprived Dr. Francona of a defense to which he was entitled.

The plaintiff's testimony established that there were essentially two structures on the farm: the chicken house and the residence. The residence was located "some distance" from the chicken house. Electrical service to both structures was provided by a line which ran to a pole in the yard and then to the residence. It is unclear whether the line to the chicken house ran from the pole or from the residence.

Sometime after eleven o'clock on the evening of January 3, 1954, the plaintiff was awakened by his wife, who told him that the lights in the residence were going dim. The plaintiff looked out of his bedroom window and saw that a portion of the upper floor of the chicken house was in flames. He got dressed, rushed out of the chicken house and entered it via the entrance vestibule on the south end. While he was inside, a draft blew the door shut, and the plaintiff was forced to exit through the building suffering burns. The plaintiff testified that his purpose in entering the chicken house was to shut off the main electrical switch. It is unclear why he felt compelled to do this. At trial, his counsel suggested that he did it "to save his family"; however, there is no evidence that the residence or its occupants were in any danger.

It is apparent that the plaintiff left a place of safety to enter the burning building. When he did so he assumed the risks of this undertaking. The defendant's tendered instruction was based upon I.P.I. 13.02. It was supported by ample evidence in the record, and I believe that the court erred in refusing to give it.

I would reverse the judgment or, in the alternative, reverse and remand the cause for a new trial.